## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Juantina M. Dee,                          :              Case No. 3:10-CV-1487

        Plaintiff,                   :

        v.                            :              **MEMORANDUM   DECISION
                                                         AND ORDER**

Commissioner of Social Security,          :

        Defendant.                   :

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Supplemental Security Income (SSI) under Title XVI of the Act. Pending are the parties' Briefs on the Merits and Plaintiff's Reply (Docket Nos. 13, 18 & 19). For the reasons that follow, the Commissioner's decision is affirmed.

### I. PROCEDURAL BACKGROUND.

On September 25, 2006, Plaintiff filed an application for SSI alleging that her disability began on June 1, 2005 (Docket No. 11, Exhibit 5, pp. 2-4 of 11). Plaintiff's request was denied initially and upon reconsideration (Docket No. 11, Exhibit 4, pp. 2-4; 11-13 of 38). Plaintiff filed a timely request for hearing and on July 2, 2008, Administrative Law Judge (ALJ) Timothy G. Keller held a hearing at

which Plaintiff, represented by counsel, and Barry Brown, a Vocational Expert (VE), appeared and testified (Docket No. 11, Exhibit 2, p. 7 of 28).  On September 10, 2009, the ALJ rendered an unfavorable decision denying an application for a period of SSI (Docket No. 11, Exhibit 3, pp. 7-19 of 19).  On April 6, 2010, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's determination the final decision of the Commissioner (Docket No. 11, Exhibit 2, pp. 2-4 of 28).  Plaintiff filed a timely Complaint in this Court seeking judicial review (Docket No. 1).

## II.  FACTUAL BACKGROUND.

### A.    PLAINTIFF'S TESTIMONY.

Plaintiff was 34 years of age, 5'4" tall and weighed 148 pounds.  She completed the tenth grade and later attained a general equivalency degree.  Plaintiff was literate, could do basic math and possessed a driver's license.  Married but living separately from her spouse, Plaintiff had custody of the couple's minor children during the school year and her spouse had custody of their children during the summer.  In the summer she visited her children approximately four days weekly while her spouse worked (Docket No. 11, Exhibit 2, pp. 12-13, 20-21 of 28).

Plaintiff suggested that she could not work because of anxiety, asthma, attention deficit hyperactivity disorder (ADHD), depression, fibromyalgia, migraine headaches, problems with her legs, osteoporosis in her hips, a broken heel and unconfirmed fibromyalgia in her legs.  The symptoms included obstructed breathing, crying spells, difficulty bending her knuckles, interior body tremors, light-headedness, memory deficits, persistent pain, panic attacks, memory deficit and fatigue(Docket No. 11, Exhibit 2, pp. 14-16, 18 of 28).

Plaintiff's headaches occurred a couple of times per month (Docket No. 11, Exhibit 2, p. 16-17).  The onset of panic attacks was linked to exposure to the public.  Plaintiff had crying spells a couple

times weekly (Docket No. 11, Exhibit 2, p. 14).  Generalized pain and discomfort escalated as the day progressed.  Plaintiff took Ibuprofen at the onset of a headache which she got a couple of times monthly.  If the headaches persisted more than a day or two, she went to the emergency room for treatment (Docket No. 11, Exhibit 2, p. 16 of 28).  When her knuckles were swollen, Plaintiff could not manipulate with her hands (Docket No. 11, Exhibit 2, p. 17 of 28).

Efforts were underway to appoint a counselor (for psychotherapy) (Docket No. 11, Exhibit 2, p. 23 of 28).  Plaintiff's medical regimen included medications  to treat depression and anxiety-- Cymbalta®, Abilify® and Hydroxyzine; Ritalin, a medication used to control symptoms of ADHD; Vitamin D, an iron supplement and an oral contraceptive to control hot flashes.  The only notable side effect of these medications was weight gain (Docket No. 11, Exhibit 2, p. 17 of 28).

During 2005, Plaintiff had a job as a security clerk at a refinery.  She examined every third car thoroughly to ascertain the presence of bombs.  Plaintiff quit the job as the onset of persistent migraines interfered with her ability to continue working (Docket No. 11, Exhibit 2, p. 11 of 28).  Plaintiff was not awarded unemployment compensation.  Unable to support herself, Plaintiff and her children moved in with her brother.  Plaintiff had child support payments as income.  She had applied for food stamps (Docket No. 11, Exhibit 2, pp. 12, 22 of 28).

Plaintiff estimated that she could sit and stand for one hour each, walk around the block and lift up to fifteen pounds.  Plaintiff opined that she had difficulty stooping and bending (Docket No. 11, Exhibit 2, pp. 17-18 of 28).  Plaintiff could dress and feed herself, grocery shop, wash dishes and clothes (Docket No. 11, Exhibit 2, p. 19 of 28).  Plaintiff explained that she watched television "all the time" and alternated sitting and lying down most of the day.  She had difficulty concentrating and remembering so she could not read, complete a crossword puzzle or complete a project at home (Docket

3

No. 11, Exhibit 2, p. 20, 21, 23-24 of 28).

Plaintiff admitted that she smoked a pack of cigarettes daily and she consumed an alcoholic beverage or two "maybe every six months (Docket No. 11, Exhibit 2, p. 22 of 28).

**B.     VE'S TESTIMONY.**

Barry Brown testified in the capacity of an independent and impartial vocational rehabilitation counselor.  He classified Plaintiff's previous employment of security guard as light, semi-skilled work (Docket No. 11, Exhibit 2, p. 24 of 28).

The ALJ posed a hypothetical question which included the following exertional and functional limitations:

(1)     capable of lifting, carrying, pushing, pulling twenty pounds occasionally and ten pounds frequently,
(2)     capable of sitting, standing and walking about six hours each out of an eight-hour workday
(3)     incapable of climbing using a ladder, a rope or a scaffold:
(4)     capable of understanding, remembering and carrying out simple tasks and instructions;
(5)     capable of maintaining concentration and attention for two-hour segments over an eight-hour work period:
(6)     capable of responding appropriately to supervisors and co-workers in a task-oriented setting or contact with others as casual and infrequent; and
(7)     capable of adapting to simple changes and avoiding hazards.

A hypothetical worker with these limitations could not perform Plaintiff's past work as security personnel.  However, a hypothetical worker with these limitations could perform work as an assembler, machine tender and cleaner.  Consistent with the Dictionary of Occupational Titles (DOT), these jobs are available as follows:

| Job | Local Availability | USA Availability |
|---|---|---|
| Assembler | 1,000 | 250,000 |
| Machine Tender Jobs | 550 | 200,000 |
| Cleaners | 800 | 400,000 |

4

(Docket No. 11, Exhibit 2, pp. 25-26 of 28).

The VE further opined that based on functional capacity evaluations performed by Lutheran Social Services and Dr. Warren Downhour, the hypothetical worker could not do any of Plaintiff's work or other work in the regional and national economies (Docket No. 11, Exhibit 2, pp. 26-27 of 28).  If the hypothetical worker had migraine headaches that disabled him or her for a day up to twice monthly and there was an onslaught of symptoms that would prevent him or her from attending work one to two days per week, the hypothetical claimant could not do any past work or other work in the region or national economy (Docket No. 11, Exhibit 2, p. 27 of 28).

### III.  SUMMARY OF MEDICAL EVIDENCE.

On April 4, 2005, Dr. Patrick M. Rao, M. D., performed a left upper extremity venous duplex examination.  There was no evidence of left upper extremity venous thrombosis (Docket No. 11, Exhibit 14, p. 2 of 43).

Since the age of 19, Plaintiff has undergone cytology gynecological examinations.  No malignant cells were ever present; however, she developed endometriosis (Docket No. 11, Exhibit 11, pp. 11 of 17; Exhibit 12, pp. 2 of 22).  On July 19, 2005, Dr. Allan Bradley, M. D., a gynecologist, injected Plaintiff with Zoladex, a medication used specifically to treat endometriosis and breast cancer in women and prostate cancer in men (Docket No. 11, Exhibit 11, p. 5 of 17; www.drugs.com/zoladex.html.).

Dr. Gary A. Poturalski, M. D., a family practitioner, treated Plaintiff for acute abdominal pain on July 20, 2005 (Docket No. 11, Exhibit 12, p. 15 of 22).

On August 9, 2005, Plaintiff underwent a diagnostic laparoscopic, lysis of peritoneal adhesions and appendectomy (Docket No. 11, Exhibit 11, p. 9 of 17; Exhibit 14, pp. 3 of 43, 5 of 43).  The post operative follow-up on August 23, 2005 showed a normal recovery (Docket No. 11, Exhibit 12, p. 6 of

22).

Stacy Kramer performed an ultrasound to determine the source of pain in the lower back at the right ovary.  The findings were unremarkable status post hysterectomy (Docket No. 11, Exhibit 12, p. 17 of 22).

On August 30, 2005, Dr. Bradley removed Plaintiff's right ovary to resolve complications arising from the presence of several cysts (Docket No. 11, Exhibit 12, p. 3 of 22).  Specimens obtained at surgery revealed small follicular cysts.  The fallopian tube epithelium were unremarkable and there was no evidence of malignancy (Docket No. 11, Exhibit 14, p. 37 of 43).

On September 27, 2005, Plaintiff complained of severe cramps that radiated to her back and thigh tops.  An intravenous pyelogram, an X-ray that provides pictures of the kidneys, bladder, ureter and urethra, was ordered to determine the source of Plaintiff's low back pain (Docket No. 11, Exhibit 11, p. 6 of 17; www.mayoclinic.com/health).

The chest X-rays taken on November 20, 2005, showed minimal scoliosis (Docket No. 11, Exhibit 14, 41 of 43).

After having a fever, vomiting and diarrhea for two days, Plaintiff presented to the emergency room on November 7, 2006.  Diagnosed with acute gastroenteritis and acute vascular headache, Plaintiff was given medication for pain and nausea (Docket No. 11, Exhibit 18, pp. 29, 32-33 of 43).

On December 1, 2006, Dr. Alice Chambly, Psy. D, determined that based on the record, there was insufficient evidence of a medically determinable mental impairment or the degree of limitation of the mental impairment (Docket No. 11, Exhibit 15, pp. 6, 18 of 19).

On December 12, 1006, Plaintiff's insurance company denied coverage for Lyrica®. a medication used to relieve neuropathic pain (Docket No. 11. Exhibit 16, p. 14 of 38).

Plaintiff complained of anxiety, difficulty sleeping, migraines and hand and wrist pain (Docket No. 11, Exhibit16, p. 5 of 38).  On February 2, 2007, Dr. James A. Gideon, M. D., obtained a blood count and chemical profile.  Plaintiff's white blood count and platelets were elevated (Docket No. 11, Exhibit 16, p. 9 of 38).  On February 14, 2007, Dr. Gideon diagnosed Plaintiff with fibromyalgia, Sicca syndrome, an autoimmune disease that classically combines dry eyes, dry mouth and another disease of connective tissue, and likely carpal tunnel syndrome (Docket No. 11, Exhibit 16, pp. 18-19 of 38; http://www.medterms.com).

Dr. Anthony M. Alfano, Ph. D, a clinical psychologist, conducted a clinical interview on April 10, 2006, after which he diagnosed Plaintiff with a depressive disorder, anxiety disorder, pain disorder, both psychological factors, and a general medical condition and panic disorder with agoraphobia over the range diagnosed (Docket No. 11, Exhibit 16, p. 25 of 38).  Results from the basic clinical interview showed an elevation on scales measuring depression, schizophrenia and psychological disorders characterized by phobias, obsessions, compulsions or excessive anxiety.  Dr. Alfano opined that Plaintiff's code type generally experienced a great deal of emotional turmoil and tended to lead a "rather schizoid lifestyle". The psychiatric deviate scale was probably elevated because of the Plaintiff's asocial and emotional remoteness.  Plaintiff's scores on the anxiety and depression scales were elevated too.  Plaintiff scored high on the repression scale which meant that she was using denial and depression to keep herself comfortable.  The post-traumatic stress disorder scale was elevated which was indicative that she was suffering stress from a previous stressful event (Docket No. 11, Exhibit 16, p. 27 of 38; www.meriam-webster.com/dictionary/psychasthenia).

On February 2, 2007, Dr. James A. Gideon conducted a consultative examination during which he found that Plaintiff had 18 of 18 trigger points consistent with a diagnosis of fibromyalgia (Docket No.

11, Exhibit 17, p. 21 of 27).

Dr. Anna Horstman determined on June 4, 2007, that Plaintiff suffered from a social phobia and anxiety.  She noted that on March 1, 2004, Plaintiff presented with a panic attack, tendency to be alone, insomnia and anti-social behavior.  Plaintiff began taking Effexor and seeing a psychiatrist (Docket No. 11, Exhibit 16, pp. 30-31 of 38).

On July 16, 2007, Dr. Albert E. Virgil, Ph. D., J. D., a psychologist, conducted a clinical interview and administered the Wechsler Adult Intelligence Scale.  Plaintiff performed borderline on the similarities subtest, average on the vocabulary subtest and average on the arithmetic subtest.  Diagnosing Plaintiff with a dysthymic disorder and anxiety disorder, not otherwise specified, Dr. Virgil credited a current, functional and past year global assessment of functioning (GAF) score, a numeric score used to subjectively rate the social, occupational and psychological functioning in adults, that was not higher than 50.  This score identified the presence of serious symptoms or any serious impairment in social, occupational, or school functioning (Docket No. 11, Exhibit 16, pp. 36-37 of 38, En.wikipedia.org/wiki/Global_Assessment_of_Functioning).

Dr. Bruce Goldsmith, Ph. D., completed a psychiatric review on July 24, 2007.  He diagnosed Plaintiff with an affective disorder and anxiety related disorders (Docket No. 11, Exhibit 17, p. 2 of 27).  Plaintiff had a moderate degree of restriction in daily living that existed as a result of her mental disorder, moderate degrees of difficulties in maintaining social functioning that existed as a result of her mental disorder and moderate degrees of difficulties in maintaining concentration, persistence and pace that existed as a result of her mental disorder (Docket No. 11, Exhibit 17, p. 12 of 27).

Dr. Goldsmith also concluded that Plaintiff was moderately limited in sustaining each of the following mental activities over the course of a normal work week and workday on an ongoing basis:

1.    The ability to understand and remember detailed instructions.
2;    The ability to carry out detailed instructions
3.    The ability to maintain attention and concentration for extended periods.
4.    The ability to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
5.    The ability to interact appropriately with the general public.
6.    The ability to accept instructions and respond appropriately to criticism from supervisors.
7.    The ability to respond appropriately to changes in the work setting.

Plaintiff had no significant limitations in her ability to:

1.    Remember locations and work like procedures
2.    Understand and remember very short and simple instructions.
3.    Carry out very short and simple instructions.
4.    Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
5.    Sustain an ordinary routine without special supervision.
6.    Work in coordination with others or proximity to others without being distracted by them
7.    Make simple work related decisions.
8.    Ask simple questions and request assistance.
9.    Get alone with co-workers or peers without distracting them or exhibiting behavioral extremes.
10.   Maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.
11.   Be aware of normal hazards and take appropriate precautions.
12.   Travel in unfamiliar places or use public transportation.
13.   Set realistic goals or make plans independently of others.

(Docket No. 11, Exhibit 17, pp. 16-17 of 27).

On July 30, 2007, Dr. Willa Caldwell, M. D., opined that Plaintiff could never climb using a ladder, rope or scaffold and her handling ability (gross manipulation) was limited.  However, Plaintiff could:

1.    Occasionally lift and/or carry twenty pounds.
2.    Frequently lift and/or carry ten pounds.
3.    Stand and/or walk about six hours in an eight-hour workday.
4.    Sit about six hours in an eight hour workday
5.    Push and pull on an unlimited basis.

(Docket No. 11, Exhibit 17, pp. 21-23 of 27).

9

On January 4 and 10, 2008, Dr. Downhour, a Doctor of Osteopathic Medicine, treated Plaintiff for symptoms related to a cold and bronchitis (Docket No. 11, Exhibit 18, pp. 12 of 43).  On February 26, 2008, he treated Plaintiff for flu-like symptoms such as nausea, vomiting and diarrhea (Docket No. 11, Exhibit 18, p. 13 of 43).

On April 8, 2008, Plaintiff was assessed for psychiatric treatment at Lutheran Social Services (Docket No. 11, Exhibit 20, p. 4 of 41).  Dr. J. D. Godwin, M. D., evaluated Plaintiff's breathing disorders on May 17, 2008, and determined that she had possible sleep apnea (Docket No. 11, Exhibit 18, p. 37 of 43).  On May 19, 2008, and for approximately one year thereafter, a certified nurse practitioner (CNP) Christopher Kalb, at Lutheran Social Services, attempted to stabilize Plaintiff's symptoms through pharmacological management, adjusting the dosages of Abilify® and Cymbalta® and using them in combination with Clonazepam, a medication used to relieve panic attacks, and Hydroyzine Pamoate, a medication used for the short-term treatment of nervousness and tension that may occur in mood disorders (Docket No. 11, Exhibit 20, pp. 15-34 of 41; Exhibit 21, pp. 2-4 of 4; Docket No. 11, Exhibit 23, pp. 14-19 of 19; Docket No. 11, Exhibit 24, pp. 21-40 of 40; http://www.webmd.com/drugs; www.nih.gov).

On July 17, 2008, Dr. Downhour completed a Residual Physical Capabilities Questionnaire and listed the conditions for which he had treated Plaintiff: fibromyalgia, anxiety disorder, asthma, manic syndrome and restless leg syndrome.  It was Dr. Downhour's opinion that Plaintiff could:

1. Sit for one to two hours;
2. Stand for one to two hours;
3. Walk for one hour.
4. Alternate between sitting and standing for one to two hours.
5. Occasionally lift ten pounds; carry twenty pounds; bend, twist from side to side, reach above shoulder level, squat and return to standing position and kneel and return to standing position; use her hands for simple grasping, pushing and pulling and fine manipulation; use both hands to push and pull; and push pull twenty pounds.
6. Frequently push/pull ten pounds.

10

Exposure to unprotected heights, moving machinery and work requiring substantial outside activity in cold or rainy weather was contraindicated (Docket No. 11, Exhibit 18, pp. 5-8 of 43).

On September 18, 2008, Dr. Downhour addressed drastic changes in Plaintiff's vision (Docket No. 11, Exhibit 22 p. 3 of 22). The specimen collected on September 18, 2008, showed a whole blood glucose level within the recommended range (Docket No. 11, Exhibit 22, p. 22 of 22). On November 12, 2008, Dr. Downhour addressed symptoms of constipation, abdominal bloating and nausea that had persisted for two to three weeks (Docket No. 11, Exhibit 22, p. 5 of 22). She returned on November 17, 2008 with breathing difficulties (Docket No. 11, Exhibit 22, p. 6 of 22). Plaintiff presented to Dr. Downhour on December 3, 2008, with nausea, diarrhea and wheezing, and on December 10, 2008, Dr. Downhour treated her for a broken heel (Docket No. 11, Exhibit 22, pp. 7-9 of 22). During the following months, Dr. Downhour, treated Plaintiff for fatigue, headaches and low back pain. Plaintiff's prescription for Ritalin was refilled (Docket No. 11, Exhibit 22, pp. 10-13 of 22).

On December 3, 2008, Dr. Rao determined that Plaintiff had a possible calcaneal fracture in the right foot. There was no film evidence of a right chest wall injury (Docket No. 11, Exhibit 18, pp. 39, 41 of 43). Plaintiff was referred to an orthopedic center and on December 4, 2008, Dr. Frank E. Fumich, M. D., a board certified orthopaedic surgeon, supervised the application of a cast/splint (Docket No. 11, Exhibit 19, p. 5 of 14).

In December 2008, Dr. Downhour determined that Plaintiff's white blood and platelet counts exceeded the recommended reference ranges which are considered "normal" (Docket No. 11, Exhibit 22, p. 19 of 22). Thereafter, Dr. Downhour addressed and/or resolved issues with Plaintiff's drastic vision changes, smoking cessation, persistent pain, nausea, diarrhea and heel fracture (Docket No. 11, Exhibit 22, pp. 3-13 of 22). Plaintiff had a cough and chest pain for one month; however the posterior/anterior

and lateral views of the chest showed no active lung disease (Docket No. 11, Exhibit 23, p. 4 of 19).
Plaintiff did demonstrate some bone loss of the lumbar spine which placed her at moderate risk for
fracture (Docket No. 11, Exhibit 23, p. 5 of 19).

On February 18, 2009, Dr. Downhour determined that Plaintiff had an iron and Vitamin D
deficiency (Docket No. 11, Exhibit 22 p. 17 of 22).

On February 17, 2009, Plaintiff experienced some relief from the right-sided heel pain (Docket
No. 11, Exhibit 19, p. 11 of 14).  The fractured heel was considered well healed on March 17, 2009
(Docket No. 11, Exhibit 19, p. 13 of 14).

Dr. Alfano provided a summary of his treatment with Plaintiff.  Apparently, he conducted seven
sessions of psychotherapy during which he taught Plaintiff visualization and relaxation techniques as a
means to cope with her pain.  Plaintiff stopped treating with Dr. Alfano due to the worry that she was
incurring unsustainable debt (Docket No. 11, Exhibit 18, p. 17 of 43).

### IV.  STANDARD OF DISABILITY

SSI is available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th
Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the
"inability to engage in any substantial gainful activity by reason of any medically determinable physical
or mental impairment which can be expected to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A); *See also*
20 C.F.R. § 416.905(a) (definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate
that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.
*Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6ᵗʰ Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V.  THE ALJ'S FINDINGS

On September 10, 2009, the ALJ applied the governing five step analyses and determined that Plaintiff was not disabled.  Upon consideration of the evidence, the ALJ made the following findings:

At step one, the ALJ found that Plaintiff had not engaged in substantial work activity as defined at 20 C. F. R. § 404.1572, since August 14, 2006, the application date.

At step two, the ALJ found that Plaintiff had the following severe impairments:  fibromyalgia, major depressive disorder and anxiety disorder.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1 (20 C. F. R. §§ 404.1525 and 404.1526).

At step four, the ALJ found that Plaintiff had the residual functional capacity to perform a full range of light work.  Specifically, she could lift, carry, push and pulling twenty pounds occasionally and ten pounds frequently and she could sit and stand and walk about six hours out of an eight-hour workday. Plaintiff could not climb using a ladder, a rope or a scaffold or hazardous machinery.  Mentally, she was limited to simple instructions and could maintain concentration and attention for two hour segments over an eight-hour work period.  Plaintiff was able to respond appropriately to supervisors and co-workers in a task-oriented setting.  Contact with others should be casual and infrequent, and Plaintiff was able to adapt to simple changes and avoid hazards.  Accordingly, Plaintiff was unable to perform any past relevant work.

At step five, the ALJ found that Plaintiff was 31 years of age, a younger individual age 18-49, with at least a high school education and the ability to communicate in English.  Considering her age, work experience and residual functional capacity, there were jobs in significant numbers in the national economy that Plaintiff could perform.  Consequently, Plaintiff had not been disabled since August 14, 2006, the date the application was filed.

(Docket No. 11, Exhibit 3, pp. 7-19 of 19).

## VI.  STANDARD OF REVIEW.

Under 42 U.S.C. § 405(g), a district court is permitted to conduct judicial review over the final decision of the Commissioner.  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra,* 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

## VII. DISCUSSION

In the Brief and Reply Brief, Plaintiff identifies four errors in the ALJ's decision. First, Dr.

15

Downhour's opinions about her residual functional capacity are entitled to complete deference or alternately, such opinions should be appropriately discounted consistent with the treating source standard. Second, the ALJ's conclusion that she received vague treatment for fibromyalgia is not supported by the record. Third, the ALJ failed to evaluate the opinions of the state agency physicians under 20 C. F. R. §416.927(d)(2). Fourth, the ALJ failed to include the findings of the state agency physician in the hypothetical question posed to the VE.

Defendant replied that substantial evidence supported the ALJ's determination of no disability. Accordingly, Plaintiff is not entitled to an award of benefits.

A.    **The Treating Physician.**

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. *McCombs v. Commissioner of Social Security,* 2010 WL 3860574, *6 (S. D. Ohio) (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of the claimant's impairment(s), including symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s), and the claimant's physical or mental restrictions." *Id.* (*citing* 20 C. F. R. §§ 404.1527(a)(2), 416.927(a)(2)). Some opinions, such as those from examining and treating physicians, are normally entitled to greater weight. *Id.* (*citing* 20 C. F. R. §§ 404.1527(d), 416.927(d)).

To qualify as a treating source, the acceptable medical source must have examined the claimant and engaged in an ongoing treatment relationship with the claimant consistent with accepted medical practices. *Id.* (*citing Smith v. Commissioner of Social Security,* 482 F.3d 873, 875 (6th Cir. 2007) (*quoting* 20 C.F.R. § 404.1502)). The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate

16

circumstances. *Cross v. Commissioner of Social Security*, 373 F. Supp.2d 724, 729-730 (N. D. Ohio 2005). Generally, more weight is attributed to treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. *Id.* (*citing* 20 C. F. R. § 404. 1527(d)(2)).

Likewise, Social Security Ruling ("SSR") 96-2p, POLICY RULING TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, *2 (July 2, 1996) provides that when a decision is unfavorable, it " must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied*."* *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*citing Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir.1999)). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Id. at* 544-545 (*citing Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2nd Cir. 2004)).

17

In the instant case, the ALJ complied with the regulations for review. The ALJ acknowledged that Dr. Downhour was a treating source and specifically adopted his findings that Plaintiff's fibromyalgia was a severe impairment. The ALJ discounted Dr. Downhour's opinions to the extent that they were not consistent with the objective physical evidence of record as a whole (Docket No. 11, Exhibit 3, p. 16 of 19). His reasons for discounting Dr. Downhour's opinions are sufficiently specific so that it is clear to any subsequent reviewers the weight he attributed to the treating source's medical opinion.

### B.     Residual functional capacity.

A claimant's residual functional capacity is the ALJ's assessment of physical and mental work abilities-what the individual can or cannot do despite his or her limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a) (Thomson Reuters 2011). Critical to this residual functional capacity finding are residual capacity opinions offered by medical sources such as treating physicians, consultative examining physicians and state agency physicians who reviewed the claimant's medical records. *Deskin v. Commissioner of Social Security*, 605 F. Supp.2d 908, 911-912 (N. D. Ohio 2008) (*citing* 20 C. F. R. §§ 416.913 and 416.945(a)(3)).

In rendering his or her residual functional capacity decision, the ALJ must give some indication of the evidence upon which he or she is relying, and he or she may not ignore evidence that does not support his or her decision, especially when that evidence, if accepted, would change the analysis. *Fleischer v. Astrue,* 2011 WL 797336, *5 (N. D. Ohio 2011) (*see Bryan v. Commissioner of Social Security*, 383 Fed. Appx. 140, 148 (3rd Cir. 2010) (*quoting Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3rd Cir. 2000) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")); *Baltazar v. Astrue*, 2011 U.S. Dist.

LEXIS 4641, *22 (W. D. Ark. 2011) (*citing Pate–Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009); 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2); SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).

Contrary to Plaintiff's argument, the ALJ provided his reasons for discounting Dr. Downhour's functional capacity assessment. Consistent with the provisions of 20 C. F. R. § 404.1527 (d), the ALJ considered that Plaintiff's fibromyalgia symptomolgy was of the severity to reasonably affect her functional capacity. However, Dr. Downhour did not provide evidence that Plaintiff had a severely diminished range of motion in the upper extremities or evidence of positive straight leg raising resulting from the fibromyalgia symptomolgy. In fact, none of Plaintiff's treating physicians, including Dr. Downhour, provided electrodiagnostic evidence that would support such extensive functional limitations endorsed by Dr. Downhour. The ALJ noted Dr. Downhour's opinions that the treatment for back pain was also appropriate for treating the fibromyalgia symptomolgy. The ALJ reasonably concluded that the fibromyalgia symptoms were sufficiently controlled with medication (Docket No. 11, Exhibit 3, pp. 13-14 of 19).

The ALJ suggested that Dr. Downhour had been liberal in his assessment of Plaintiff's residual functional capacity, finding severe limitations that were incongruous with the medical evidence. Consequently the ALJ properly discounted Dr. Downhour's assessment of Plaintiff's residual functional capacity (Docket No. 11, Exhibit 3, pp. 13-14 of 19).

Substantial evidence supports the decision not to give Dr. Downhour's opinion of functional capacity controlling weight. To the extent that the correct legal standards were applied and the Commissioner's findings of fact are supported by substantial evidence in the record, the Magistrate must

affirm the ALJ's finding.

**C.      Treatment of Fibromyalgia**

Plaintiff argues that the ALJ's finding that she received vague treatment for fibromyalgia is not supported by the record.

The existing Sixth Circuit case law and the Commission's own regulations recognize that fibromyalgia is not the type of medical condition that can be confirmed by objective testing, given that fibromyalgia patients often present no objectively alarming signs. *Soden v. Commissioner of Social Security*, 2009 WL 3188469, *3 (S.D.Ohio,2009) (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 243 (6th Cir. 2007); *citing Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 820 (6th Cir. 1988)).  The process of diagnosing fibromyalgia includes the testing of a series of 18 focal points for tenderness and noted tenderness on at least eleven and then ruling out of other possible conditions through objective medical and clinical trials.  *Id.*  It is difficult to rule out other possible conditions as contributing to disability, without a comparison of the symptomolgy from the claimed condition to other possible conditions, an impossible task without first acknowledging the presence of the claimed condition.  *Id.*

The medical evidence supports the ALJ's finding that Plaintiff received vague treatment for fibromyalgia.  The ALJ acknowledged that Dr. Gideon discovered that Plaintiff had 18 of 18 tender points which are characteristic of fibromyalgia's presence.  Dr. Downhour concurred in this analysis (Docket No. 11, Exhibit 18, p. 5 of 43).  In addition, Dr. Downhour treated and managed various diseases.  He did not conduct any tests to ascertain the existence of focal points or that he ruled out possible conditions through objective medical and clinical trials.  Nevertheless, the ALJ found that Plaintiff had fibromyalgia and that it was severe.  Apparently, the ALJ gave controlling weight to Dr. Downhour's diagnosis of

fibromyalgia.          **D.      The State Agency Physician.**

The opinions of Dr. Virgil, a state agency physician, were entitled to an evaluation under 20 C. F. R. §416.927(d)(2) or in the alternative, an explanation should have been given that detailed the weight to be given Dr. Virgil's opinions.

Generally speaking, the ALJ **must** consider in accordance with the regulations the opinion evidence provided by the state agency physicians. *Barker v. Astrue*, 2010 WL 2710520, * 4 (N. D. Ohio 2010).  Opinions of non-examining state agency medical consultants have some value, and under certain circumstances can be given significant weight. *Branch v. Astrue*, 2010 WL 5116948, *5 (N. D. Ohio 2010).  This occurs because the Commissioner views non-examining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  *Id.* (*citing* POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996).  Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as those of treating physicians.  *Id.* (*citing* SSR 1996 WL 374180 at *1; *see* 20 C.F.R. § 404.1572(d), (f); *see also* SSR 96-6p at *2-*3).  Regulations at 20 C. F. R. § 416.927(d)(2) set forth detailed rules for evaluating medical opinions offered by state agency medical consultants:

> Regardless of its source, every medical opinion received is evaluated.  Unless a treating source's opinion is given controlling weight under paragraph (d)(2) of this section, SSA consider all of the following factors in deciding the weight to give any medical opinion.
> (1)     Examining relationship.
> (2)     Treatment relationship, including the length of the treatment relationship and the frequency of examination and the nature and extent of the treatment

relationship.
(3)     Supportability
(4)     Consistency.
(5)     Specialization.
(6)     Other factors.

20 C.F.R. § 416.927 (d) (Thomson Reuters 2011).

The record reflects that the ALJ followed the Commissioner's regulations.  Initially he set forth the standards for consideration of evidence from non-examining physicians.   The ALJ explained what Plaintiff told him during the interview and he made a conclusory remark about the lessor weight given Dr. Virgil's opinions (Docket No. 11, Exhibit 3, p. 16 of 19).  The ALJ considered that Dr. Virgil conducted a one-time clinical interview in July 2007 and that there was no treatment relationship.  Dr. Virgil's conclusions were supported in large part by Plaintiff's answers to his inquiry and test results from the WAIS examination.  When compared to the evidence in the record as a whole, the conclusions that Dr. Virgil drew were not consistent with Plaintiff's capacity to perform at least simple tasks (Docket No. 11, Exhibit 3, pp. 10-12, 14, 16 of 19).

The ALJ acknowledged that Dr. Virgil, a non-examining state agency medical consultant, provided opinions of some value.  However, the ALJ properly discounted Dr. Virgil's opinion that Plaintiff was incapable of sustaining a daily work regimen as it was inconsistent with the other mental evidence of record.

### E.     The Hypothetical Question

Plaintiff argues that the ALJ erred in failing to give the limitations posed by Dr. Virgil in the hypothetical question posed to the VE.

In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray

22

a claimant's physical and mental impairments.  *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010) (*see Howard v. Commissioner of Social Security*, 276 F.3d 235, 239, 241 (6th Cir. 2002); *see also Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir. 2004) (though an ALJ need not list a claimant's medical conditions, the hypothetical should provide the vocational expert with ALJ's assessment of what the claimant "can and cannot do.").  The only limitations that need to be included in the hypothetical questions are the ones that the ALJ finds "credible." *Dippel v. Commissioner of Social Security*, 2011 WL 976610, *10 (N. D. Ohio 2011) (*See Infantado v. Astrue*, 263 Fed. Appx. 469, 477 (6th Cir. 2008) (*citing Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  The Sixth Circuit has recognized that "[i]f the [ALJ's] hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints." *Hargrove v. Astrue,* 2011 WL 741983, *6 (N. D. Ohio 2011) (*citing Blancha v. Secretary of Health & Human Services*, 927 F.2d 228, 231 (6th Cir. 1990); *citing Hardaway v. Secretary of Health & Human Services*, 823 F.2d 922, 927-28 (6th Cir. 1987)).

Here, the ALJ explained that the inconsistency of Dr. Virgil's opinions with the medical evidence as a whole was a basis to discount his opinions.  Since he found Dr. Virgil's opinions unsubstantiated, the ALJ was not obligated to include such findings in the hypothetical questions posed to the VE.  The Magistrate concludes that since Dr. Virgil was a state agency physician, the ALJ was not bound by his unsubstantiated limitations.  Therefore, excluding Dr. Virgil's opinions that were incredible from the hypothetical question posed to the VE was not harmful error.

### VIII.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:   September 7, 2011